The Chief Justice

delivered the Opinion of the Court.
The principal question in this case, is whether a writing given by Woodard to Fitzpatrick, in September, 1835, purporting on its face, to be an absolute bill of sale of two negro men slaves, for the price of eleven hundred and fifty dollars, should be deemed to have been intended only as a mortgage, as claimed by Woodard, and denied by Fitzpatrick.
It appears that the consideration of the transfer of the slaves, consisted of twenty three judgments, confessed before a justice of the peace, by Woodard to Fitzpatrick, upon as many promissory notes, executed on the same day, in discharge of obligations which had been previously given by Woodard to one Woodcock, for about eight hundred dollars, for moneys loaned, and assigned to Fitzpatrick, and of obligations which had been given, also to Fitzpatrick, for loans of money to the amount of about three hundred dollars; and that the paper purporting to be a bill of sale, was signed and delivered immediately after the confessions of judgments, and on the same day.
The bill — filed by Woodard, for redemption of the slaves, and for general relief — charges that Woodcock and Fitzpatrick had combined to oppress and defraud him; had each loaned him small sums of money, at various times, for several years, and had exacted exorbitant usury; whereby an aggregate of not more, than five *118 hundred dollars of principal, had been swelled, at the end of about three years, to eleven hundred and fifty dollars. That Woodcock and Fitzpatrick are jointly interested, also, in the contract for the slaves; and therefore they are both made defendants.
To a bill by a debtor, against the assignee of his note, to be relieved of usury, and redeem property apparently sold, but really pledged for the debt, and charging combination between the assignor and assignee—tho’ the combination is denied, and not proved, still the assignor is a proper party, on account of his privity and interest. A bill against an assignee, charges that the assignor, also a deft. extorted enormous usury from the compt. which is included in the assigned debt; the answer, silent as to the usury, virtually admits it; but neither the proofs nor pleadings are so specific as to justify any decree as to the usury; nor would the answer of the assignor, admitting it, be any evidence against the assignee: still it was erroneous to dismiss the bill absolutely as to the assignor. Deft. should have been required to answer specifically or an investigation had; or, as the assignor was not liable for restitution till the debt and usury were paid—the bill as to him might have been dismissed without prejudice, at the election of the compt.
*118 They deny the charge of combination, and deny, also, that Woodcock has any interest in the contract for the slaves. Woodcock, however does not respond to the charge of usury; and Fitzpatrick, admitting that he exacted usurious interest, says that the usury did not exceed seventy five dollars altogether, but that he requires proof that it even equalled that sum; and moreover, insists that he never loaned to Woodard as much as three hundred dollars altogether; but says he does not recollect the precise rate of usury exacted by him.
The Circuit Court dismissed the bill, absolutely, as to both defendants.
Woodcock was properly joined as a co-defendant, in consequence of his privity and interest as assignor, even though there may be no proof of combination, or of a joint interest with Fitzpatrick. But though his answer virtually admits that he exacted usurious interest, no such specific facts are admitted by him or proved against him, as to enable the Court to render any decree against him, or against Fitzpatrick, for those indefinite exactions. Had his answer been responsive to all the allegations of the bill, and so specific as to have enabled the court to ascertain the amount of his usurious exactions, still, as that answer would not have been evidence against his assignee, there could have been no decree against the latter, for those exactions. But nevertheless, we are of the opinion that the Circuit Judge erred in dismissing the bill absolutely, against Woodcock, because, as he tacitly admitted that he had exacted some usury, it was the duty of the Court either to require him to answer fully, or to institute an enquiry as to the amount of usury, or to dismiss the bill as to him, without prejudice, on the ground that, as the usury exacted by him had not been in fact paid (if the bill of sale be a mere collateral security,) he is not yet liable for restitution, and will not be so liable, until the *119 amount of the notes assigned to his co-defendant shall have been paid.
Upon a bill to redeem slaves held by an absolute bill of sale, upon the allegation, that the writing was intended for a mortgage only-if the answer admits that there was illegality in the consideration (as that it was infected with usury,) parol proof is admissible to show the true nature of the transaction, and even to contradict the written memorial.
Detail of circumstances, which taken altogether, authorize the conclusion that a bill of sale purporting to be absolute on its face was, in fact, only intended as a collateral security.
And we are of the opinion, also, that Fitzpatrick’s answer authorized a decree against him, for at least seventy-five dollars, for usury; and moreover, that the bill of sale should be held only as a mortgage.
A part of the consideration being admitted to be illegal, there is no difficulty in admitting extraneous facts for the purpose of explaining the true contract, and of even contradicting and defeating the technical effect of the literal import of the written transfer of the slaves. And the following leading circumstances, corroborated, as we think they are, by others less prominent, are, in our judgment, sufficient, when properly considered altogether, to authorize the judicial conclusion that the bill of sale was intended by Woodard as a mortgage only, and , that he was induced by ignorance, mistake, or fraud, to sign it as it is:—
1. The distribution of an aggregate sum of eleven hundred and fifty dollars into twenty three separate parcels; the execution of as. many notes, for the purpose, of hastening judgments before a justice of the peace; confessions of twenty three judgments, oh the day of the execution of those notes, and the transfer of the slaves on the same day, conduce persuasively to the conclusion, that Woodard’s object was not to pay promptly, by a sale of his slaves, which could have been more conveniently and less expensively done, without any such circuity; but was only to procure indulgence by thus liquidating and securing the debt. And the same facts indicate that, greater certainty and security, and not final satisfaction, were Fitzpatrick’s objects also.
2. One witness testifies that, she understood the bill of sale as intended to be only a mortgage; and another that, in a short time after the date of it, Woodard offered to redeem; that he said to Fitzpatrick, in the streets of Somerset, that he knew that a mortgage only was intended, and that Fitzpatrick did not respond to that declaration;' but then agreed to accept the sum of eleven hundred and fifty dollars, and surrender the slaves at the end of the *120 year 1836, insisting that he had paid for their hire until that time.
A party allowed to redeem slaves pledged to an assignee, to secure the assigned debt and other loans, is required to pay the debt with interest, excluding some usury on loans made by the assignee him-self, and deducting also, the hire of the slaves up to the date of the final decree.
A party hired two slaves, at $150 for a year, and afterwards, obtained a bill of sale of them, to secure to a debt of the owner which had been assigned to him; when the year was half out, the owner, having to provide for another debt which he owed the assignor, obtained $200 of the hir-rer — $100 by giving up the note for $150—and $100 for the hire for another year: held, that this must be deemed one of many usurious transactions that occurred between the parties; and upon the redemption of the slaves, the hirer must account for their hire, at a reasonable rate, credited by the payments made.
*120 3. At the date of the written transfer of the slaves they were according to the proof, worth at least fifteen hundred dollars, and perhaps two thousand dollars.
4. Woodard is shown to be an imbecile, credulous, and facile man, peculiarly liable to be a victim of artifice and usury; and Fitzpatrick is represented as a shrewd, provident and dextrous man.
From these facts alone, we should feel authorized to conclude that the bill of sale should be considered as a collateral security only, for whatever shall be justly due from Fitzpatrick to Woodard.
And, as before suggested, there are some corroborating and minuter circumstances which we cannot well detail. Indeed, it is impossible to read the whole record carefully, without feeling a strong conviction that Woodard has been the blind victim of stratagem and exorbitant usury, and never intended to sell his slaves to Fitzpatrick, irredeemably, for any debt which he owed him.
We are, therefore of the opinion, that Woodard is entitled to redeem his slaves, by paying to Fitzpatrick eleven hundred and fifty dollars, with legal interest there'on from the date of the judgments, after deducting seventy five dollars for usury exacted by Fitzpatrick, and the value of the use of the two slaves.
There is some difficulty in fixing the time when the charge for hire should commence. Fitzpatrick has had the use of the slaves ever since the first of the year 1835, and the bill alleges, that he never paid any thing for hire, excepting what he may have paid in usury. His answer avers that he had, prior to the execution of the bill of sale, hired the slaves for one hundred and fifty dollars for the year 1835; that during that year, Woodard hired them to him for the year 1836, for one hundred dollars advanced, and also accepted one hundred dollars in discharge of his obligation for one hundred and fifty dollars, for the year 1835, then half ended. But there is no sufficient proof of all these averments; and it is certainly rather improbable that, whilst Woodard was indebted to Fitzpatrick for money loaned, the latter would pay him for the hire *121 of the slaves, otherwise than out of the debt so due. Fitzpatrick exhibits a promissory note, dated October 24th, 1834, for one hundred and fifty dollars, for the hire of the slaves for the year 1835, purporting to have been given by himself and one Stewart to Woodard, and stipulating that the amount should be “paid out of a note” which Fitzpatrick held on Woodard and Woodcock. A note on Woodard and Woodcock, which became due and payable on the same 24th of October, 1834, is also exhibited in the record.
From all the circumstances, we have much reason for presuming that the note referred to, on Woodard and Woodcock, was for money loaned at usurious interest; that on the day when it became due, Woodard, being unprepared for prompt payment in money, was induced to hire his slaves for the succeeding year, at a reduced price, for the purpose of providing for the partial extinguishment of that debt; and that this transaction, together with the alleged payment of the note for the hire, with one hundred dollars, only six months before it became due, should be considered as a link in the chain of usurious impositions, with which Woodard was evidently and for years oppressed.
Although we may glean from the record, facts sufficient to authorize the presumption that the usual rate of exaction was at least thirty three and one third per cent, yet we are unable to ascertain either the amounts or times of the loans; and therefore, we cannot judicially decide, that Fitzpatrick ever exacted, altogether, upon loans made by himself, more than seventy five dollars, with which he is already charged.
But as he has exhibited the note for one hundred and fifty dollars, executed and probably taken up before the date of the mortgage, he should not, in our opinion, be charged with the entire value of the hire for the year 1835. As however, according to his own account, he paid only one hundred dollars for the hire for that year, and as, also, there can be but little doubt that the use of the slaves for that year, was worth more than one hundred and fifty dollars, he should, as we clearly think, be charged with the true value of the use for 1835, after de *122 ducting one hundred dollars therefrom. And we are as clearly of the opinion that, for the year 1836, after the execution of the mortgage, he should be charged with the value of the hire without any deduction on account of the alleged payment of one hundred dollars, unsupported by any sufficient proof. And he should of course be charged, also, for the use of the slaves from the first of January, 1837, until the date of the final decree, hereafter to be rendered.
Then, in fixing the terms of redemption, Woodard is to be entitled to a credit for seventy five dollars for usury, to be applied at the time when the judgments were confessed; and also, for the difference between one hundred dollars, and the value of the hire of his two slaves for the year 1835, to be applied at the end of that year; and lastly, to the annual value of the use of those slaves, from the first of January, 1836, to the date of the future decree, to be applied as the hire became due at the end of each year.
And as to Woodcock, the bill may either be dismissed without prejudice, or prosecuted further by requiring a more satisfactory answer, by amending the bill, or otherwise, as Woodard may elect.
Decree reversed, and cause remanded, for such further proceedings and decree as shall be proper, according to the foregoing opinion.