SAMUEL BURKETT, *Appellant, v.* ELIAS G. MCCARTY, *Appellee.*

## Syllabus of Opinion.

1. It is not slander to charge that one has falsely taken an oath prescribed by an unconstitutional and void act of the Legislature.

2. The act known as the "Expatriation Act," approved March 16, 1862, was unconstitutional.

3. A citizen may, with the consent of his State, express or presumed, expatriate himself, but no mere act of State legislation can *per se* denationalize him without his concurrence.

4. Such compulsive excision is a heavy punishment, which cannot be inflicted without *judicial* conviction of some crime or act, denounced by legislation as a forfeiture of citizenship, any more than a bill of attainder without *judicial* conviction can constitutionally punish a citizen.

5. Whether a citizen has been guilty of an offense involving the forfeiture of his right to vote is necessarily a judicial question which can be constitutionally decided by the judiciary on a full and fair trial on an indictment or a presentment, but cannot be rightfully adjudged collaterally or incidentally by the officers of the election. Nor can a

test oath be constitutionally required in such a case, nor the refusal to take it be deemed a judicial trial and conviction of the imputed offense.

6. A legislative act cannot make voluntary rebellion involuntary expatriation.

APPEAL FROM BRACKEN CIRCUIT COURT.

October 8, 1866.

OPINION OF THE COURT BY JUDGE ROBERTSON:

This is an action of slander brought by the appellant against the appellee, in which the plaintiff alleged that, being a citizen of Kentucky, and having resided in Bracken county for more than two years, and in the Berlin precinct more than sixty days immediately preceding the last annual election, he offered to vote in his precinct at that election, but was not permitted to vote unless he would take the oath prescribed by the expatriation statute adopted March 6, 1862, for only an alleged violation of which his vote had been challenged; that thereupon he submitted to the requisition, and in the oath administered by one of the judges of the election he swore that he had never done anything prohibited by that statute; and that after that oath the defendant (appellee), speaking in reference thereto, publicly charged that therein he had sworn falsely. The Circuit Court, adjudging the statute unconstitutional, and the oath consequently void for want of legal authority to require it, sustained a demurrer to the petition, and thereupon rendered judgment in bar of the action.

Unless the statute was constitutional, the utterance as charged did not amount to slander, because the oath was administered without lawful authority, and was no more binding than the void enactment itself; and, therefore, although the statute has been since repealed, we are reluctantly compelled to decide in this case on its constitutional validity.

The act does not apply to *residence,* but only to *citizenship.* Had it declared that a citizen's joining the Confederate army or serving its government should be deemed a temporary nonresidence in Kentucky, suspending his right of suffrage at her elections, a very different question would have been presented to this court. But while a citizen may, with consent of his State, express or presumed, expatriate himself, no mere act of State legislation can, *per se,* denationalize him against his will or without his concurrence. Such compulsive excision of a citizen is a heavy punishment, which cannot be constitutionally inflicted without

*judicial* conviction of some crime or other act denounced by legislation as a forfeiture of citizenship, any more than a bill of attainder without judicial conviction can constitutionally punish a citizen. The most vital principle of the Constitution is that which divides the three vital elements of all sovereignty — legislative, judiciary, and executive — among three separate organs of the people, and prohibits each from exercising functions not allotted to its sphere; and consistently with this conservative theory the Legislature *alone* can define offenses and prescribe the punishment, and the judiciary *alone* can adjudge the accused guilty.

Whether joining the Confederate army and leaving the State to serve in its cause was, *per se,* voluntary expatriation, would be a judicial question. No legislation could make it so, nor could a court so decide on the simple act alone. The Expatriation Statute denounces a forfeiture of *citizenship* on certain conditions, *and disfranchisement is only a legal consequence of that forfeiture.* To decitizenize a freeman is a tremendous blow. It deprives him of his chosen country and home, and sunders his most endearing relations, social and civil. Is not this severely punitory; and who can be lawfully so punished without conviction; and how can there be lawful conviction without trial and proof; and what other department than the judiciary can try and decide on the evidence?

The eighth section of the second article of the Constitution provides that " every free white male *citizen* of the age of twenty-one years who has resided in the State two years, or in the county, town, or city in which he offers to vote one year, next preceding the election, *shall* be a voter." And the fourth section of article 8 provides that " laws shall be made to exclude from office and from suffrage those who shall thereafter be *convicted* of bribery, perjury, forgery, or other crime or misdemeanor."

Free suffrage is thus guaranteed to every *citizen* of Kentucky on the prescribed conditions only of age and residence; and this organic right being fundamental and above legislative power, no legislative act can require any other qualification than citizenship and the constitutional age and residence, nor deprive any such citizen of suffrage for any other cause than " *conviction* " of some crime or misdemeanor defined by a legislative enactment and made punishable by such disfranchisement. This is expressly re-

quired as indispensable to the forfeiture of suffrage as well as of office, and is, therefore, as necessary in the one class of cases as in the other. Without trial and conviction an office cannot be constitutionally adjudged forfeited for crime. How then can suffrage be held to be forfeited for unadjudged crime. The Expatriation Act denounces the forfeiture of citizenship for imputed treason, and the forfeiture of the right of suffrage *only as a necessary consequence of such denationalization.* Then, as without conviction, citizenship cannot be forfeited by mere imputation of crime, suffrage, its constitutional incident, cannot be thereby forfeited. Citizenship being the seminal principle of suffrage, the latter cannot be lost by the imputation of crime which shall not have forfeited the former. As long as a man continues to be *de jure* a citizen, unconvicted of any crime forfeiting his incidental right of suffrage, his age and residence alone can determine his constitutional right to vote. And if his citizenship cannot be adjudged forfeited for imputed crime before legal conviction, the same imputation cannot alone deprive such a citizen of his constitutional right to vote.

The Expatriation Statute was enacted for the benevolent purpose of preventing citizens of Kentucky from joining or aiding the rebel army, and of inducing such as had joined or aided it to return to their allegiance to their State, and to the constitutional union. As a penalty it denounces a forfeiture of citizenship, and the only disfranchisement which it contemplated was the constitutional and inevitable sequence of the loss of citizenship. We do not doubt that the Legislature had the constitutional power to prescribe the conditions on which a citizen should, against his will, forfeit or lose his citizenship. But how and by whom shall that forfeiture or privation be ascertained and fixed? So the Legislature may rightfully forfeit a citizen's right to vote as a penalty for perjury or other crime. But if a citizen be challenged at the polls as disqualified by crime, can he be excluded without or before conviction, and who can convict?

This is necessarily a judicial question, which can be constitutionally decided by the judiciary on a full and fair trial on an indictment or a presentment. It could not be rightfully adjudged, collaterally or incidentally, by the officers of election; nor could any test oath or self-condemnatory oath be either constitutionally required, or the refusal to take it be deemed a judicial trial and

conviction of the imputed treason. Notwithstanding the results of such a mock trial, the citizen still would remain a citizen according to fundamental law; and, so continuing, he must have the legal right to vote as any other citizen of the age and residence prescribed by the Constitution. *A legislative act cannot make voluntary rebellion involuntary expatriation.*

The oath being required not to show that the appellant had changed his residence, but only that he had committed a crime which might deprive him of his citizenship and of his right of suffrage as a necessary consequence, it was without constitutional authority or sanction, and consequently void, and, therefore, nothing sworn to under it could have been, in the legal sense, perjury or punishable false swearing; and, of course, the charge made by the appellee to that effect was not in itself actionable slander.

Wherefore, the judgment of the Circuit Court is affirmed.

JUDGE WILLIAMS dissenting.

*W. C. & T. F. Marshall, for appellant.*

DISSENTING OPINION BY JUDGE WILLIAMS:

The defendant presented himself at the polls in the general election of this State in August, 1865, and demanded to vote; he avers in his petition,

> " that being a citizen (of Bracken county), over the age of twenty-one years, had resided in said county more than two years, and in the Berlin precinct more than sixty days next preceding said election, and the said plaintiff made known to the judges of said election his desire to vote and demanded his vote when his vote was challenged *upon the ground* he had expatriated himself and was not entitled to vote."

And that one of the judges of the election *" swore said plaintiff touching his qualifications as a voter in said precinct."* And that said judge " required him to negative the act to amend chapter 15 of the Revised Statutes, entitled citizens, expatriation and aliens," of March 11, 1862, and being so sworn and required to negative said acts, he did negative the several acts of expatriation provided in the statute of March 11, 1862, chapter 509, entitled " An act to amend chapter 15 of the Revised Statutes, entitled citizens, expatriation, and aliens," Session Acts 1861–62, pp. 70–77, which

provides that any citizen who shall enter into the civil or military service of the so-called Confederate States, or so-called Provisional Government of Kentucky, or who having heretofore entered shall continue in either of such services after this act takes effect, or shall take up or continue in arms against the military forces of the United States or State of Kentucky, or shall give voluntary aid and assistance to those in arms against said forces, shall be deemed to have expatriated himself, and shall no longer be a citizen of Kentucky, nor shall again be a citizen except by a general or special statute.

And that whenever a person attempts, or is called on to exercise, any of the constitutional or legal rights *belonging only to citizens* of Kentucky, he may be required by oath to negative this expatriation, and upon his failure or refusal, he shall not be permitted to exercise such right.

And in relation to such negation on oath appellee said appellant had sworn a lie.

Appellant brought this action of slander for this utterance, and appellee demurred, assigning for cause, that said statute of March 11, 1862, was unconstitutional. Said oath of appellant extrajudicial, hence did not render appellant liable to a criminal prosecution, therefore the utterances of appellee were not actionable. The court sustained this demurrer, and by its judgment dismissed plaintiff's petition; whereupon he prosecuted this appeal, and a majority of this court is for an affirmance — from which I dissent.

1. Because whether it be or not constitutional the words set out in the petition are in themselves slanderous, and, therefore, actionable.

2. Because said Act of March 11, 1862, is constitutional and valid.

By section 2, article 8, chapter 27, Revised Statutes, 1 Stant. 385, it is provided:

> "If any person, in any matter which is or may be judicially pending, *or on any subject in which he can be legally sworn, or in which he is required to be sworn, when sworn by a person authorized by law to administer an oath, shall wilfully and knowingly swear, depose or give in evidence that which is untrue and false, he shall be confined in the penitentiary not less than two nor more than six years.*"

In the case of the Commonwealth v. Powel, 2 Metc. 12, this court held that by the terms of this section, to swear willfully and knowingly to that which is untrue and false, on any subject which the person can be legally sworn, is made an offense, punishable as a felony. And to constitute an offense of this class, it is not made necessary by the statute, either that the false oath should be taken in a matter judicially pending at the time, or in a matter material to any point in question.

The offense is complete if it be sworn that the false oath was taken knowingly and willfully, on a subject on which the party could be legally sworn, and before a person legally authorized to administer oaths. And in this very case the affidavit upon which the false swearing was predicated was a proceeding wholly unknown to the law, yet upon a subject upon which the party might have been legally sworn, it was to open a decree by affidavit when it should have been by petition setting out the decree, the error, etc., verified by affidavit.

This statute was made to embrace a large class of cases which by the common law were not offenses punishable, but yet were regarded as demoralizing and degrading, and was made to prevent false swearing before officers legally authorized to administer oaths on any and every subject wherein the affiant could legally be sworn.

Now in this case the appellant offering to vote could legally be sworn in relation thereto, consequently if he should knowingly and willfully swear falsely, whether the statement be material or not, it would be an offense within the statute denouncing false swearing. Much more should this be the case when there is an enactment recognized by the judges of the election as binding law, authorizing the oath. It will be observed that his averment is that his vote was *challenged upon the ground that he had expatriated himself,* but under what statute or by what act is not averred, and that the judge *swore him touching his qualifications as a voter in said precinct,* all of which was fully authorized by other statutes than the Act of March 11, 1862.

Then with what grace can the calumniator, who intending to disgrace his neighbor and render his character infamous among his acquaintances, be permitted to plead that the statute authorizing the oath is unconstitutional, and, therefore, his slanderous and defamatory words not actionable? What can be thought of the justice of the law, or its tender regard for reputation, if the slanderer

can thus utter words calculated to degrade his neighbor and render his character infamous, and then escape from the consequences of his slander by pleading the invalidity of the statute, instead of relying on the upright defense of justification and the truth of his utterances?   The fact that he shrinks from the plea is a circumstance that should arouse the wakeful vigilance of the courts, and incline all their discretion against him; it is at best a miserable subterfuge to escape presumed responsibility for a grievous wrong done his neighbor.

The maliciousness of the utterance, its falsity, and the injury done his neighbor's character, in no wise depends on the validity of said statute of March 11, 1862, and his responsibility should likewise be unaffected by it.   The judge of the election had the right under other statutes to swear him *as to expatriation,* also as to his *legal qualifications as a voter in said precinct,* and if in relation thereto he made false statements, knowingly and willfully, though not pertinent to the question, the statute denounces this as false swearing, and makes him liable to a conviction for a felony, and to suffer ignominious punishment in the State penitentiary.

But if appellant's right of action depended wholly on the validity of this enactment of March 11, 1862, its constitutionality can be fully demonstrated, nor need we resort to that respect at all times due from the judiciary to the legislative department, nor the high and patriotic character of those members who voted for it, including many of our ablest jurists and statesmen.   The objections to its constitutionality will first be considered, that the reasons for its validity may be the more striking.

It is objected that the enactment conflicts with section 4, article 8, of our State Constitution, which declares that " laws shall be made to exclude from office and *from suffrage* those who shall thereafter be convicted of bribery, perjury, forgery, or other crimes or high misdemeanors."   This is an imperative injunction on the Legislature to provide by law for the exclusion from suffrage of citizens who may be so convicted; in other words, to provide a forfeiture of one of the rights of the citizens on such conviction, though he may still remain such, entitled to all the other rights pertaining thereto.   But what has it to do with the determining who shall be citizens?   Citizenship is acquired in the manner that the Legislature may designate, it may be lost in the way provided by the Legislature; the loss of citizenship is not to depend on conviction for crime, its forfeiture in no wise depends on the commis-

sion of crime. It is neither a crime nor misdemeanor to remove from the State, yet such removal forfeits the right of citizenship, and judges of election may try this removal and reject any one proposing to vote therefor without any previous judgment or conviction.

Suffrage pertains alone to the *resident white male citizen of twenty-one years* of age, and who has resided in the State the requisite length of time; he may still remain with all these requisites, but if convicted of crime may forfeit his right of suffrage; this is the meaning, and the whole meaning, of said constitutional provision.

It will be at once perceived that this enactment, so far from forfeiting suffrage for crimes, by exonerating the party from the duty and responsibilities of the citizen, exonerates him from crime; for every act of expatriation in said statute, if perpetrated by a citizen, would be an act of *treason* as by section 2, article 8, of the State Constitution it is declared that treason against the State shall consist only in levying war on the Commonwealth or in adhering to its enemies, giving them aid and comfort.

But it is urged that by section 8, article 2, State Constitution, " every *free white male citizen* of the age of twenty-one years, who has resided in the State two years," etc., is entitled to suffrage, and no law forfeiting this right without a conviction for crime or high misdemeanor is constitutional; but this view overlooks the important fact that this nor no other clause of the Constitution attempts to define who shall be citizens, but leaves this wholly with the law-enacting department.

Citizenship is the primary foundation for suffrage; whilst it will not of itself confer the right of suffrage, yet suffrage cannot be conferred without this elementary prerequisite; much the larger portion of the citizens of the State are not voters, because they are not white *males,* or are not of full age, or have not the prescribed residence as to time.

Therefore the important and primary question is, not whether the citizen has forfeited his right of suffrage, but whether the person offering to vote *be or not a citizen,* hence neither of said constitutional provisions can relate to this question, or have any important bearing on its solution.

But again it is said that this statute requires a man to testify against himself in contravention of section 12, article 13, of the State Constitution, which provides that in prosecutions by indict-

ments and information " he cannot be compelled to give evidence against himself," but this is no prosecution either by indictment or information, nor indeed made an offense against law; it is simply a test of citizenship, nothing more, nothing less. It is an authority to all public functionaries whose official duties may require them in any case or proceeding to ascertain whether any person be a citizen, before he be permitted to exercise the rights of, and discharge the duty of, a citizen; it is the prescribing of certain rules whereby the qualifications may be ascertained of the voter or juror or other person. And as the ascertainment of such qualification in that manner has already been done at every election, and in every court of original jurisdiction where a jury may be required, who shall be housekeepers with a family.

And the ascertainment in the same way of a large class of sureties in bonds required by law to be executed, wherein the prescribed qualification of the sureties must be ascertained.

In all these instances, the voter, the juror, and the surety have been required to discover on oath whether he possessed the requisite qualification, and if these be lacking, he has been rejected, yet this has never been deemed requiring a man to testify against himself within the purview of said constitutional provision, and clearly is not so. The Constitution has specifically enjoined on the Legislature the duty of supporting the privilege of free suffrage by laws regulating elections, and has thus confided to its discretion and judgment the character of laws to accomplish this, without limit or qualification.

It is peculiarly the important and primary duty and function of the judges of election to ascertain and determine the qualification of those presenting themselves for the exercise of the elective franchise, and without this it would be utterly impossible to protect the purity and freedom of elections; in no other way could an uncontaminated public sentiment be arrived at. Having shown that no specific clause of the Constitution prohibits this enactment, the question might be regarded as settled, but there are so many affirmative reasons, that a few of the most important may be reasonably indulged.

It is not contended, nor, indeed, could it reasonably be, that this enactment is in conflict with any provision of the United States Constitution, therefore this examination will be wholly confined to the State Constitution.

It is confidently asserted as part of our political philosophy, recognized by the founders of our governments, State and National, sanctioned by the unbroken current of judicial authority of the States and United States, that the States were the original sovereignties, and that in making the National government they surrendered a portion of that sovereignty to it, and that, so far as the sovereign power was by the Constitution of the United States delegated, the National government became also a sovereignty.

That another class of sovereign powers were prohibited to the States but not delegated to the United States, and with the exception of such powers as were delegated to the United States by its Constitution or prohibited to the States all other powers were reserved to the States respectively or the people.

Consequently, to use the language of this court in by-gone days, with the exception of these delegated or prohibited powers, the States are yet " supremely sovereign." Commonwealth v. Morrison, 2 B. Mon. 89; Bland v. Smith, 6 B. Mon. 475.

That the National government and State governments make a perfect government, protecting all the rights of the citizen, whether foreign or domestic, State or National, and that neither alone can do this because of the imperfection of either without the other.

That each has its proper and well-defined sphere, and within this each is sovereign supreme, and intended to be perpetual; that the Constitution of each State is a part of the National government within each State, and the United States Constitution is a part of the government of each State; that in fact the State and National Constitutions are but different branches of one whole and perfect government, and that one simple, complete, and perfect allegiance binds the citizen to each and both branches of this perfect government, and that a revolutionary overthrow of either violates the Constitution of both.

The Constitution and laws of the United States being supreme, and the Supreme Court of the United States being the final arbiter in all questions of law and equity arising under the Constitution, there can be, theoretically, no cause for revolution.

It is true that there are a class of consolidationists on the one side who would absorb all the sovereignty of the States in the National government, and thereby destroy the substratum upon which it rests, while another class of extreme States rights regard

the United States Constitution as a mere compact, deny to the National government any sovereignty or supremacy, and hold its existence at all times subject to the caprices and whims of each State, but these being judges are not jurists and being politicians are not statesmen, but are those who have studied the Constitution of their country and its political history to but little advantage.

Then regarding the State government as a sovereignty, what are its powers? And what the relation of its citizens toward it?

"Sovereignty is the union and exercise of all human power possessed in a State; it is a combination of all power; it is the power to do everything in a State without accountability; to make laws, to execute and apply them; to impose and collect taxes, and levy contribution," etc. 2 Bouv. Law Dict. 537; Story's Com. on Const., § 207.

The Legislature of a State being the representative of the sovereignty may exercise all these sovereign powers not delegated by the Constitution of the United States, nor prohibited by it to the States, unless inhibited by the State Constitution.

*"Allegiance is the tie which binds the citizen to the government in return for the protection which the government affords him."* 1 Bouv. Law Dict. 93.

The citizen and government are under mutual and correlative duties; allegiance on the part of the citizen, protection on the part of the government.

But who are and how ascertained to be citizens? Our mother Virginia began at a very early period to declare by enactment who should be citizens, and how these might expatriate themselves.

The Legislature of Kentucky began to legislate on these subjects, also, at a very early period, in various ways.

By our Revised Statutes (§ 1, art. 1, chap. 15, 1 Stant. Rev. Stat. 238), it is enacted that all *free white persons* born in this State, or in any other State of this union, who may become residents of this State, all *free white persons* naturalized under the laws of the United States, who may become residents of this State, are declared to be citizens of this State.

This is broad and general in its provisions, and includes both sexes and all minors; it, therefore, confers the rights of citizenship for all civil purposes, and to all males who may reside the necessary length of time, being twenty-one years of age, it ripens into political rights, not only to vote, but to hold office.

And the second article of this chapter provides for the expatria-tion of the citizen, either by deed acknowledged or proved in the County Court relinquishing the character of citizen and a de-parture out of the State with the intention to remain absent, or where a citizen of this State shall reside elsewhere and become a citizen of some other State or some foreign nation; but such ex-patriation if attempted while the United States or this State be at war with any foreign nation will not be valid except where he has actually removed and become a citizen of some other State or nation.

This statute shows that our Legislature has from the earliest period of our State existence down to the enactment of March 11, 1862, exercised the most unlimited right to declare who shall be regarded as citizens, and how and by what acts they may expatriate themselves.

So tenacious have been our people to affirm the right of volun-tary expatriation, that in all three of our State Constitutions may be found the same provision of section 29, article 13, Bill of Rights of our present Constitution, " that emigration from the State shall not be prohibited," thus limiting the right of the Legis-lature from withholding their assent to voluntary expatriation when the citizen emigrated.

So perpetual allegiance finds no place in our State Constitution, nor the history of its laws, as fully expounded by this court, opinion by Chief Justice Robertson, in Allberg v. Hawkins, 9 Dana, 117, where the removal of the husband to the province of Texas, and the remaining there by his widow, after his death, was regarded as an expatriation with the presumed assent of the government of Kentucky, and a bar to the right of dower, and had the provision of said section 29 been referred to, the court might have said with the positive constitutional sanction of the State.

By section 8, article 3, chapter 32, 1 Stant. Rev. Stat., the rules for determining the residence of a party offering to vote are pre-scribed, among which is that if a party removed to another State and there votes, though his intention was to return to this State, he loses his residence, and, by reason thereof, his right to vote, and here the Legislature has prescribed several acts by which a citizen shall be deemed to have expatriated himself and thereby lose his right of suffrage, but these statutes have never been deemed to conflict with any provision of the Constitution, and the

difference in constitutional power to enact these or that of March 11, 1862, is not perceived; both are the exercise of soverign power not delegated to the National government, nor prohibited to the States by the United States Constitution, nor inhibited by the State Constitution.

It is true that the National judiciary have not recognized the right of the citizen to expatriate himself from the United States, without the consent of the government, but the political departments have seemed to recognize this as the right of the citizens of this and other nations.

The several acts of Congress authorizing foreigners to be naturalized require that they should by oath abjure all allegiance to any foreign prince, potentate, or sovereignty, whatever, whilst Attorney-General Black, August 17, 1857, recognized the right of expatriation on the part of both native and naturalized citizens by a removal to foreign countries and there becoming citizens, which would be incompatible with their allegiance to the United States.

Opinions of Attorney-General United States, General Cass, whilst Secretary of State of the United States, in a letter of instruction to our minister at Berlin, July 8, 1859, said: "The right of expatriation cannot, at this day, be doubted or denied in the United States." Law Wheat on International Law, 918. Dr. Twist, one of England's most eminent civilians, admits that the doctrine of perpetual obedience or allegiance to a government " is the creature of civil law, and finds no countenance in the law of nations." Twist's Law of Nations, Vol. 1, chap. 19, § 160, p. 263.

Nearly all the civilized nations, and certainly nearly all the European monarchies, now permit expatriation, including France, Russia, Austria, Bavaria, Wurtemburg, Prussia, and Spain. Law Wheat on International Law, 912–916. Then the right of voluntary expatriation, or the right of the citizen by the consent of the government, to expatriate himself is now recognized by nearly all of the civilized powers of the earth.

That the government has the right to determine when the citizen, by his own voluntary act, has so expatriated himself is more universally admitted.

The government being sovereign has the undoubted right to prescribe the duties of its citizens, and to declare what acts are inconsistent with that tie of allegiance which binds its citizens to it, and requires protection from it in consideration thereof, else its

8

protecting power might often be invoked by those not entitled to
its protection, because of not observing their obligation of allegi-
ance. This continued allegiance and the continued obligation of
the government in return therefor must necessarily be determined
either by the sovereign or the citizen, and as the sovereign in all
other cases prescribes the rules of duty on the part of the citizen
and the punishment for a breach of its laws, and provides the
forum in which this shall be tried, why can it not determine and
prescribe when and by what act this tie of allegiance may be
broken, and also the manner of ascertaining the fact? This is but
the exercise of a sovereign right not delegated to the United States,
nor prohibited to the States, and, as has been shown, not inhibited
by the State Constitution.

Then regarding these propositions as incontestable:

1. That allegiance is due from the citizen to the State.

2. That this allegiance is not perpetual, but may be severed by
the voluntary act of the citizen, especially with the consent of the
State.

3. That the State being sovereign has the right to prescribe the
duty of the citizen, and what acts inconsistent with its own well-
being shall be regarded as a breach of this tie of allegiance and
release it from the duty of protection, and may prescribe by what
acts the citizen shall be deemed to have expatriated himself, and
thereby forfeit his political privileges.

At the date of this enactment a civil war was raging in the
United States in which the government of the United States on one
side and the recently formed government of the Confederate States
of America on the other were the belligerents.

The people of those States of the American Union which ad-
hered to its cause and government constituted its party, and the
people of those States which seceded from the Union and adhered
to the cause of the Confederate States constituted its party. A
majority of the people of Kentucky had by several elections de-
termined to abide in the Union; her Legislature had made common
cause with the United States. She recognized her obligation to
furnish her quota of men to suppress the rebellion, her territory
had been invaded by the enemies' troops, many of her towns pos-
sessed by them, her railroads controlled, and her revenues seized
by this enemy, and finally it set up upon her soil and over her
people a hostile revolutionary State government with a provisional
Governor, Legislature, judicial and ministerial officers, which was

fully recognized by the Confederate States government by the admission of representatives and senators from the revolutionary State governments into its Congress, and fully recognizing it as one of its members.

This revolutionary State government made common cause with the Confederate States and both by their combined military forces were attempting to overthrow the legitimate State government. To prevent her citizens from giving aid and comfort, countenance or assistance to these belligerent revolutionary State and Confederate governments, the Legislature declared, as well it might, that by voluntarily aiding and assisting these belligerent enemies of the State of Kentucky should be deemed as acts of expatriation on the part of any of her citizens, and that they should no more be citizens without her consent either by a general or special law.

It is hard to conceive a case in which a State in the exercise of her sovereignty could more justifiably declare that the action of her citizens should debar them from political privileges by declaring that their own hostile acts in joining her belligerent enemies who were trying to subdue her sovereignty, subjugate her people, and revolutionize her government should be deemed the highest and most incontestable evidence that they were no longer of her, identified with her cause, partakers of her fortune, or willing to abide her fate.

This was the voluntary breaking of that tie of allegiance which binds the citizen to the State, and fully authorized the sovereign so to declare.

If the citizen does not owe allegiance to his State and can break this tie, some power or tribunal must have the right to declare by what acts such tie may be broken, or, in other words, the power to prescribe the duty of the citizen must reside somewhere, and some power must exist competent to declare when and by what acts the citizen may absolve his State from the obligation to protect him. This power must then reside either in the sovereign or the citizen. Can there be any doubt that it resides in the sovereign, to be directed, controlled, and prescribed by the sovereign masses of the State through their legislative representatives?

Then if the sovereign has a right to determine when the tie of allegiance is broken, or by what acts it may be broken so as to release the sovereign from the duty of protection, by what means shall this determination be manifested? Is it necessary that it

shall be by indictment or information? Could this be an appropriate proceeding for such purpose? Should an indictment or information be filed to test the qualification of the surety? And if not, why should such proceedings be had to test the qualification of the voter? And in times of revolution and turbulence and commotion when the courts are not and cannot be held, is the State to remain wholly at the mercy of the revolutionist? And shall he be permitted to exercise all the rights and privileges of the citizen under the State whilst he is levying war on the State and giving aid and comfort to its enemies? Or when he comes to exercise the highest, the noblest, and most important franchise that belongs to the citizen, and that which in times of perfect security and public tranquillity is withheld from a large majority of citizens, that of voting for the public organs of both the State and National governments, is it at all unreasonable, or in the least a stretch of power, for the sovereign to demand that he should by his own oath show he has not voluntarily broken the tie of allegiance to it, and has not voluntarily perpetrated such acts as it has said shall be deemed acts of expatriation? And can it not as legally test by its judges of election these qualifications as it can that of removal, or the exercise of the rights of citizenship in any other State? Indeed, is not the entering the military service and swearing allegiance to such insurgent government, and the voting in their elections, the exercise of citizenship therein, as much as to do so in times of peace in that of any other State? And is not this an allegiance toward these insurgent governments wholly incompatible with allegiance to the State of Kentucky, and utterly at war with the duties of a loyal citizen? And I might ask what other tribunal or means has ever been provided by law to test the legal qualification of the voter, in the first instance, but the judges of election? If a man's right to vote be questioned, by what means and before what forum can he have this right tested, in the first instance, other than the judges of election? So far as the body politic, both of the State and National governments are concerned in this question of the elective franchise, the State Legislatures are the sole guardians, because the right to vote for representatives in Congress and for President and Vice-President is by the United States Constitution regulated by the provisions of the State and are the same as are entitled to vote for the most numerous branch of the State Legislatures, and whom the State

admits to vote for its representatives is entitled to vote for representatives in Congress, for the election for President and Vice-President, and the State Legislatures elect the United States, senators.

But at last the question may be finally stated as follows:

There is an insurgent provisional State government, which constitutes part of the insurgent Confederate government, both of which are at war with the State of Kentucky and the United States; a minor portion of the people of Kentucky give their allegiance and assistance to these insurgent governments; they vote to send representatives in Congress of the insurgent Confederacy, for the purpose of increasing its civil power and military strength, by giving it all the material support possible in men and money; they adhere to its fortunes, desire its success, and whilst the war is still raging, these same men claim to exercise the highest, noblest, most sacred, and important rights of a citizen of Kentucky and of the United States, a right of the most momentous consequences to the State and Nation, that of participating in their political affairs and their elections, and claim to send representatives to the State Legislature and National Congress, who would sympathize with their cause, and represent their sentiments and feelings, and who would by all means and in every manner possible thwart the policy of the State and Nation, withhold from them supplies of men and money, and in every way reduce their military strength, and thus dwarf the unlimited and essential powers of self-defense and self-preservation on the part of legitimate State and National governments until these should stand as mere miserable, drivelling, impotent pigmies before the swelling giant powers of these insurgent, revolutionary organizations, swollen into vast proportions by their own aid. Would an enlightened, Christian, proud, chivalrous people, having the least regard for the perpetuity of their own governments, their own equality therein, their own manhood, any pride of ancestry, or country, or regard for their posterity, submit to such a political monstrosity? And would not a Constitution that should impose such political absurdities be discreditable to the intelligence and civilization of the age? In politics it would be a monstrosity unequalled, the *reductio absurdum*.

It has been fully shown that so far from a conviction of crime this statute exonerates from the crime of treason denounced by the State Constitution, also from the crime of felony denounced

by the statute of October 1, 1861; it is simply what it professes to be, a law defining and ascertaining who are citizens, and by what acts the citizen shall be deemed to have voluntarily expatriated himself, by the assent of the State; thus instead of punishing them as citizens, declaring such acts shall be deemed acts of expatriation, and not acts of treason or felony.

This statute has been unconditionally repealed; it is to be regretted it could not have rested here, without asking the judiciary to dwarf the inherent giant powers, belonging to legitimate government to perpetuate their own existence, until in future revolutions these shall be found wholly incapable of resisting the rebellious by whom they may be assailed.